No. 31          August 30, 2013          229

IN THE OREGON TAX COURT
REGULAR DIVISION

SERENITY LANE, INC.
and Serenity Lane Health Services,
*Plaintiffs,*

*v.*

LANE COUNTY ASSESSOR
and Department of Revenue,
*Defendants.*

(TC 5082)

Plaintiffs (taxpayer) appealed disqualification by Defendant Lane County Assessor (the county) of taxpayer's status as a charitable institution exempt from ad valorem property tax for the 2010-11 tax year. The county and Department of Revenue (the department) argued that taxpayer's addiction treatment programs and activities lacked the statutory "gift or giving" component required to qualify for exemption. Following trial, the court found that taxpayer had provided extensive testimony and evidence showing that it had intent to make its services widely available to poor and indigent individuals, as well as to those more readily able to pay for treatment, that taxpayer provided treatment to patients at a cost well below the market rate, and that this factor as well as other factors involved with taxpayer's activities, met taxpayer's burden of proof as to the gift or giving element, and that as a whole, taxpayer was a charitable institution for purposes of the statute, and the subject property was exempt from taxation pursuant to ORS 307.130.

Trial was held January 28, 2013, in the courtroom of the Oregon Tax Court, Salem.

Dennis W. Percell, Arnold Gallagher Percell, et al., Eugene, argued the cause for Plaintiffs (taxpayer).

Steven E. Dingle, Lane County Counsel, Eugene, argued the cause for Defendant Lane County Assessor (the county).

Darren Weirnick, Assistant Attorney General, Department of Justice, Salem, appeared for Defendant Department of Revenue (the department).

Decision for Plaintiffs rendered August 30, 2013.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This case comes before the court for decision following a trial in the Regular Division. Plaintiffs Serenity Lane,

Inc. and Serenity Lane Health Services (Serenity) appealed from the disqualification, by Defendant Lane County Assessor (the county), of taxpayer's status as charitable institutions exempt from ad valorem property tax for the 2010-11 tax year.[1] Serenity argues that they are charitable institutions, as that term is used in ORS 307.130 and that they actually and exclusively use the property at issue in this case to conduct their charitable work—treating the disease of substance addiction. The county agrees that Serenity has many of the salient features of a charitable institution and does not challenge Serenity's allegations regarding exclusive use or possession. The county does argue, however, that Serenity's operations do not involve the "gift or giving" required for exemption as charitable institutions.

This Opinion should be read in context with this court's Opinion in *Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245 (2013).

## II.    FACTS

Serenity operates addiction treatment programs throughout this state. Serenity's operational hub is located in central Eugene, between the downtown commercial district and the campus of the University of Oregon. The physical plant of Serenity's central Eugene location has expanded over time, and by the tax year at issue had come to occupy substantially all of one full city block and parts of an adjacent block. At the time of trial Serenity had plans in the future to sell this facility and to construct a new, larger facility in the nearby town of Coburg.

Serenity is composed of two separate legal entities, SLI and SLHS. Both entities are organized as IRC section 501(c)(3) nonprofit corporations.[2] In the late 1980s

---

[1] In opinions and orders of the Oregon Tax Court, the plaintiff is normally referred to as "taxpayer" in the body of the opinion or order. In this case the activities of the two plaintiffs are so extensively intertwined that despite the existence of two separate legal entities, Plaintiffs may best be considered as one singular operation. That being the case, in this opinion Plaintiffs are collectively referred to as "Serenity." When the individual plaintiffs are discussed separately, Serenity Lane, Inc. is referred to as "SLI" and Serenity Lane Health Services is referred to as "SLHS."

[2] All references to the Internal Revenue Code (IRC) are to the 2008 edition.

Serenity's management decided to separately incorporate the two entities as a way of shielding Serenity's assets from potential civil liability. SLHS owns Serenity's physical plant and provides administrative support for SLI. SLI, in turn, leases the physical plant from SLHS and operates Serenity's addiction treatment programs.

Serenity's primary use for its real property in central Eugene during the tax year at issue was to operate an inpatient residential addiction treatment facility. Serenity's facility was licensed as a specialty hospital and employed a medical staff of physicians and nurses in addition to counselors trained in treating substance addiction.

Serenity offers inpatient residential treatment and detoxification (detox) at its central Eugene location. Serenity's staff are equipped for "uncomplicated detox." The court understands that term to mean medically managed detox of an individual, without the need to simultaneously treat other acute medical conditions that are independent of the patient's addiction. Most of Serenity's patients undergo detox as a preliminary step in either inpatient residential treatment or intensive outpatient treatment, but the testimony at trial indicated that detox is a separate service that is billed at a different rate by service providers and reimbursed at different rates by the Centers for Medicare and Medicaid Services (CMS) and other insurance providers.

Serenity also offers outpatient treatment. Outpatient treatment takes two forms: intensive outpatient treatment and nonintensive outpatient treatment. Intensive outpatient treatment requires a relatively substantial time commitment from patients over a span of several weeks and seeks to produce many of the salutary effects of inpatient residential treatment, while still allowing patients to accommodate work schedules and avoiding some of the costs associated with housing and feeding inpatient residential patients. Serenity offers intensive outpatient treatment as a lower cost alternative to inpatient residential treatment and uses intensive outpatient treatment as the principal treatment option for the indigent and low-income patients served through Serenity's "New Hope" program. Serenity offers nonintensive outpatient treatment primarily in the form of

"recovery support" for patients who have already completed either inpatient residential treatment or intensive outpatient treatment. Patients who undertook treatment with Serenity receive an allotment of free recovery support hours at no additional charge. Serenity also offers recovery support treatment, for a fee, to patients that undertook either residential or outpatient treatment with other service providers.

Serenity's "New Hope" program exists to offer treatment options for indigent and low-income individuals. It is housed out of a facility separate from Serenity's downtown residential treatment facility. The testimony at trial was to the effect that Serenity typically serves patients who have insurance through the Oregon Health Plan through the New Hope program, but also looks for other signs of acute financial distress, such as reliance on food stamps. While neither party has given precise figures for the number of patients treated through the New Hope program during the 2009-10 and 2010-11 tax years, the record indicates that during Serenity's 2009 and 2010 fiscal years, Serenity treated 137 patients with insurance coverage through the Oregon Health Plan.[3] Serenity also offered detox treatment to patients on the Oregon Health Plan, though this service falls outside of the New Hope program.

In addition to its treatment of individuals suffering from substance addiction, Serenity also sponsors an internship program to train aspiring addiction counselors. Serenity hosts ten interns per year in a program aimed at achieving the training necessary for certification as a Certified Alcohol and Drug Counselor (CADC). The interns do not pay for this training, and are given a stipend to help defray living expenses while involved with the program. Interns obtain hands-on experience counseling Serenity's patients under the supervision of Serenity's CADCs in the internship program and in many instances Serenity has hired former interns to work as CADCs after completing the program. The testimony at

---

[3] At trial, Serenity's CEO also mentioned so-called "free slots" associated with the New Hope program. Neither party developed on this testimony, but in context the mention of "free slots" appeared to suggest the presence of patients in the New Hope program in addition to those with insurance coverage through the Oregon Health Plan. The record does not contain figures showing how many such patients might exist, if any.

trial was to the effect that Serenity's interns receive, free of charge, an education that is equivalent to what is offered by counseling programs at several institutions of higher learning in this state, and that upon completion of the program Serenity's interns have the requisite knowledge to take the CADC licensing examination. Over the years, Serenity has hired several of its former interns to work as CADCs. Interns are not, however, in any way bound to work for Serenity after completing the program.

Prior to the 2010-11 tax year, the county considered SLI and SLHS charitable institutions exempt from ad valorem property tax under ORS 307.130. In March of 2010, the county began a review of the exempt status of both entities and requested documents from Serenity substantiating their charitable nature. Serenity complied with this request, but the response failed to satisfy the county. Following a further exchange of letters, the county removed the exemptions of both SLI and SLHS. Serenity then appealed that decision of the county to the Magistrate Division. The magistrate found for the county, and Serenity appealed to this division of the court.

### III.   ISSUE

Whether Serenity's operations involve the "gift or giving" required for exemption from property tax as charitable institutions.

### IV.   ANALYSIS

A.   *Statutory Framework*

As an initial matter, the court will address the statutes that the court must consider in analyzing this case. ORS 307.130(2) provides:

> "[T]he following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

> "(a)    *** only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."[4]

---

[4]  All references to the Oregon Revised Statutes (ORS) are to the 2009 edition.

Observant readers will note that the way that Serenity has structured its operations poses a problem in directly applying ORS 307.130 to Serenity's particular situation. While SLI and SLHS might be said to form an overall whole—Serenity—that whole is comprised of two distinct legal entities, one of which, SLI, leases the real property at issue in this case from the other, SLHS. As a result of this arrangement, ORS 307.130 cannot apply directly to SLI because by its own terms the statute applies only to "property *owned or being purchased*" by a qualifying institution.

ORS 307.166(1) provides the way forward. The relevant text of ORS 307.166(1) provides:

> "If property is owned or being purchased by an institution, *** that is granted exemption or the right to claim exemption for any of its property under a provision of law contained in this chapter, and the institution, organization or public body leases or otherwise grants the use and possession of the property to another institution *** that is likewise granted exemption or the right to claim exemption for property under a provision of law contained in this chapter, the property is exempt from taxation if used by the lessee or possessor in the manner, if any, required by law for the exemption of property owned or being purchased by the lessee or possessor ***."

Phrased differently, if an institution that is entitled to claim exemption from property tax under a provision of ORS chapter 307 leases its property to another institution that is also entitled to claim exemption from property tax for property that it owns, then the property remains exempt from property tax as long as the lessee institution uses the property in the manner required under the statute that would entitle that lessee institution to claim exemption for the property if it owned the property.

The result is that, because of Serenity's internal organization, each of the two components of Serenity must individually qualify as charitable institutions to satisfy the terms of ORS 307.166. The saving grace is that in the past this court has concluded, when presented with analogous separations of administrative functions from the substantive work of a charitable institution, that property devoted to the administrative functions of an otherwise charitable

institution is exempt when it is not used in a profit-making business and is used for the advancement of the charitable work of the institution. *Archdiocese of Portland v. Dept. of Rev.*, 5 OTR 111, 124 (1972). Because the county has not raised the separate existence of SLI and SLHS as a bar to exemption, the court will take a similar approach on the grounds that, while SLI and SLHS are separate legal entities, they operate under unified management and can most reasonably be described as component parts of an overall whole. In other words, the court will look at Serenity's overall operation as if it were one allegedly charitable institution. If the court concludes that these overall operations are charitable for purposes of ORS 307.130, it will then conclude that SLHS and SLI are each individually charitable institutions for purposes of applying ORS 307.166.

B.   *Whether Serenity is a Charitable Institution*

When determining whether an allegedly charitable institution meets the requirements of ORS 307.130, Oregon courts look to whether the institution meets three requirements:

(1)   Charity as the organization's "primary, if not sole, object";

(2)   The organization's operations must serve the charitable mission of the organization; and

(3)   The presence of an element of "gift or giving" in the activities of the organization.

*SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 812 P2d 1292 (1991). The parties are in agreement that Serenity meets the first two of these requirements. More specifically, the county agrees that Serenity's sole purpose is to operate addiction treatment programs on a not-for-profit basis and does not dispute that Serenity does, indeed, operate such programs without an eye to personal gain or profit for the individuals that own or control Serenity. As often happens in cases such as this one, however, the parties are in disagreement as to whether Serenity has shown that its operations involve the element of "gift or giving" required of a charitable institution under ORS 307.130.

When determining whether the operations of a given institution involve "gift or giving," Oregon courts turn to another multi-factor test. Unlike the test for determining whether an institution is a charitable institution for purposes of ORS 307.130, not all of the factors looked at in this test need to be present for a court to determine that the "gift or giving" requirement has been met. *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 310, 360 P2d 293 (1961). In addition, the list of factors is not exhaustive; a court can find that sufficient "gift or giving" exists for reasons other than those specifically listed in this test. *Id.* However, the factors listed have been found to be especially probative of the issue of "gift or giving" and so have been relied upon by this court and by the Supreme Court in numerous past cases. These factors are:

> "(1)   Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(2)   Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> "(3)   Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed; and
>
> "(4)   Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent."

*SW Oregon Pub. Def. Services*, 312 Or at 87 (quoting Oregon Administrative Rule (OAR) 150-307.130-A(4)(d)(C)). Serenity argues that its operations involve several different types of "gift or giving." Serenity's alleged "gift or giving" takes the following forms:

> (1)   Need-based scholarships to reduce the cost of treatment for some patients;
>
> (2)   Charging rates below those that the market for the type of treatment that taxpayers provide would reasonably bear;
>
> (3)   Providing free education to individuals training to work as drug and alcohol addiction counselors;
>
> (4)   Providing treatment for the indigent and for those enrolled in the Oregon Health Plan at rates

substantially below Serenity's already below-market rates; and

(5)   Community outreach education for employers.

In the following analysis, the court will discuss whether the forms of gift or giving that Serenity alleges satisfy the "gift or giving" requirement. In so doing the court will first analyze Serenity's alleged giving in light of the four "gift or giving" factors laid out above. To the extent that any form of giving alleged by Serenity does not neatly interact with the four "gift or giving" factors, the court will consider it on its own terms. Serenity must prove the presence of "gift or giving" in its operations by a preponderance of the evidence. ORS 305.427.

1.   *Consideration of the four traditional "gift or giving" factors*

With regard to the first "gift or giving factor," SLHS and SLI are both organized as not-for-profit corporations under IRC section 501(c)(3). Serenity and the county appear to be in agreement that with the exception of a cash reserve necessary for operations, Serenity reinvested the excess of its revenues over its expenses into expanding its operations. Serenity's past expansions of its original facility in central Eugene and current plans to expand its operations by constructing a new facility in Coburg is probative of this issue. The county does not allege that Serenity's revenues inured to the benefit of any private individual, other than to the extent that Serenity's employees are, of course, paid for their services.

With regard to the second "gift or giving" factor, the record is harder to conclusively assess. Serenity orients its inpatient residential treatment program toward working and middle class individuals. Serenity offers treatment options for the indigent and for individuals on the Oregon Health Plan, but does not typically admit such individuals to inpatient residential treatment. At first glance, this would appear to weigh against Serenity. However, in his testimony, Serenity's CEO offered what the court considers valid therapeutic reasons for keeping its indigent patients separate from its inpatient residential patients. Serenity's CEO testified to the effect that Serenity treats its indigent

patients separately from its inpatient residential patients because indigents suffering from substance addiction tend to suffer from additional co-morbid conditions that complicate addiction treatment. Serenity has attempted in the past to comingle its indigent and non-indigent patient populations and has found that it resulted in inadequate treatment for both groups. The court accepts this explanation. However, the second "gift or giving" factor specifically calls for the "same treatment," irrespective of ability to pay. The court concludes that this factor weighs somewhat against taxpayer, but not so much so as to be determinative of the issue of the presence of "gift or giving."

With regard to the third factor, the county does not allege discrimination on the basis of race, skin color, or religious convictions, and the record contains no evidence of such discrimination. The court also concludes that Serenity's doors were open to rich and poor alike. While Serenity's evident disinclination to take on indigent patients on the same basis as it took on other patients weighs against it on the second of the "gift or giving" factors, Serenity's undertaking to provide outpatient treatment for indigent patients through its "New Hope" program clearly evidences a desire to provide treatment options for the indigent and poor, albeit in a setting separate from its main treatment facility. Serenity's acceptance of patients on Medicaid and providing detox services to patients on the Oregon Health Plan further evidences a positive desire to make its services widely available to the poor, as well as to the relatively affluent patients that made up the bulk of Serenity's inpatient residential patient population.

The record on the fourth factor is mixed but likewise weighs overall in favor of a finding of the presence of "gift or giving." Serenity's CEO testified to the effect that Serenity does have a system of "scholarship" giving—in other words, Serenity gave need-based discounts on the cost of care for patients with limited financial assets. However, Serenity's CEO also testified that Serenity only rarely gave care at no charge whatsoever. Serenity's CEO claimed that there was a legitimate therapeutic reason for this insistence on its patients paying Serenity *something* for treatment, in that it gave its patients a feeling that they had an investment in their recovery from addiction. This claimed motivation has

the potential to be self-serving, but in this case the court believes that it is genuine. It is consistent with other practices of Serenity, and Serenity's CEO made clear in his testimony that Serenity accepted *de minimis* or token payment from truly needy patients for whom even a small amount of money could represent a significant investment.

Two factors limit the amount of weight the court can give to the existence of Serenity's scholarship program and willingness to take token payments from indigent patients. First, in the case of indigent patients making token payments it was not clear from the record whether such patients would have the same treatment options as patients that were better able to pay for treatment. The record contains an account of at least one patient admitted to Serenity's inpatient residential facility, and subsequently to the EXSL program, but the testimony at trial suggests that this was a rare case.

Second, the record does not contain any information regarding the criteria Serenity uses to qualify patients for scholarships or to calibrate the amount of the discount appropriate for any given patient. This court discussed in *Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245 (2013), how the third and fourth "gift or giving" factors are very closely interrelated. While the existence of a need-based sliding scale of fees for treatment weighs, at the margins, in favor of a finding of the presence of "gift or giving," the contours of the sliding scale are extremely probative of whether the doors of an institution are truly open to "rich and poor alike." If, as a practical matter, the poor and the indigent are still generally unable to access the services of an institution despite the existence of a need-based sliding scale of fees, then the institution may well be admirable, but it is not charitable.

The actual dollar amounts of charitable giving during the 2010 and 2011 tax years are in the record, and they are not insubstantial; they amount to roughly 2.3 percent of Serenity's overall revenues during each of those calendar years. Nonetheless, in the absence of evidence tending to show Serenity's guidelines for distributing their scholarship money, the court cannot say any more than that the evidence in the record relating to the fourth gift or giving

factor weighs marginally in favor of finding the presence of gift or giving.

The court's analysis of the four traditional "gift or giving" factors leans somewhat in the direction of concluding that "gift or giving" is present in Serenity's operations. The court finds particularly probative the substantial evidence in the record before the court of Serenity's intent to make its services widely available to poor and indigent individuals, as well as to those more readily able to pay for treatment. This conclusion is tempered, however, by Serenity's general policy of not admitting indigent patients to its inpatient residential treatment facility and the lack of evidence in the record before the court detailing the contours of Serenity's scholarship program. However, on the whole the analysis supports a finding of the presence of "gift or giving."

### 2. *Serenity's other forms of alleged "gift or giving"*

In addition to the forms of giving discussed above, Serenity alleges three forms of giving that do not mesh neatly with the four "gift or giving" factors discussed above. These supposed forms of giving are Serenity's alleged provision of treatment at below-market rates, Serenity's internship program for aspiring CADCs, and Serenity's educational outreach to employers.

The administrative rules of the Department of Revenue implementing ORS 307.130 recognize that the "gift or giving" requirement may be met by providing products or services to those in need at below-market rates. OAR 150-307.130-(A)(1)(d). At trial, Serenity provided extensive testimony and a report by a professional economist purporting to show that Serenity provides treatment to patients at a cost well below the market rate.

The gist of Serenity's expert report and testimony was that Serenity most likely charges at or modestly below the market rate for residential and intensive outpatient treatment. At the same time, however, the expert's report tends to show that Serenity charges substantially below the market rate for two specific types of treatment: detox and recovery support counseling for patients who have completed a course of residential or outpatient treatment. The

overall result being that Serenity's patients are charged significantly less than the market rate for overall treatment.

Serenity's expert sought to establish that Serenity offers detox at below-market rates by comparing the cost of detox for patients of Serenity to the rates other hospitals in this state charge for "uncomplicated detox." The results of this comparison approach support a conclusion that Serenity did provide uncomplicated detox at rates far below what the market would bear for such treatment. In addition, while Serenity's expert discussed this subject in a different section of his report, the record further indicates that Serenity provides detox treatment to individuals on the Oregon Health Plan at a cost significantly reduced from Serenity's normal charges for detox—charges that, as noted above, already appear to be below the market rate.

The county did not place in the record any evidence tending to contradict the conclusions of Serenity's expert. Rather, the county relies entirely on objections to Serenity's expert report. The county objects to Serenity's expert analysis regarding detox for two reasons: first, the county argues that the uncomplicated detox services provided by Serenity and those provided by full-service hospitals are not comparable because full-service hospitals have the capacity to provide extensive medical treatment in addition to detox. Second, the county argues that these services are not comparable because Serenity primarily provides detox treatment to patients as a preliminary step in residential treatment—a service that full-service hospitals do not typically provide.

The county's sole reliance on such objections reflects the county's failure to develop a record on this issue. The county provided two witnesses to rebut Serenity's expert witness report and testimony. However, the first of these witnesses confined his testimony to criticizing the approach taken by Serenity's expert. The county failed to qualify its second witness as an expert in the market for addiction treatment services and, as a consequence of this failure, the court had no choice but to treat this witness' testimony as hearsay not subject to any exception to the bar on hearsay evidence. In short, the county was unable to present any

admissible evidence tending to rebut Serenity's expert conclusion that Serenity offers detox at below-market rates.

The record before the court with regard to whether Serenity offers detox to its patients at below-market rates consists, in its entirety, of a expert report tending to show that Serenity does, indeed, offer detox at below-market rates. Serenity has carried the burden of proof on this issue.

For the same reason, the court must conclude that a preponderance of the evidence supports the conclusion of Serenity's expert with regard to Serenity's charges for recovery support treatment. Here, again, the county failed to provide competent, admissible evidence tending to show a different market rate than the one provided by Serenity's expert and instead relied upon criticisms of the expert's approach. The preponderance of the evidence on this question again supports Serenity's position.

These conclusions, coupled with the evidence tending to show that Serenity's charges for inpatient residential and intensive outpatient treatment were at or near the market price for such services, lead to the further conclusion that Serenity did charge substantially less than the market rate for its addiction treatment programs. This conclusion, coupled in turn with the court's analysis above under the four traditional "gift or giving" factors, takes the court a long way toward a finding that "gift or giving" is present in the activities of Serenity. However, for the sake of thoroughness, the court will address the two remaining forms of giving alleged by Serenity.

The county argues that Serenity's internship program should not be considered as indicating the presence of "gift or giving" because the program requires an outlay of only a very small portion of Serenity's revenues and because Serenity obtains certain benefits from the program by way of recruiting new CADCs. The court disagrees with both of the county's arguments. First, when it comes to discerning the presence of "gift or giving," the size of a particular component of a purported package of gifts does not dictate whether it is worthy of consideration. The question is whether individuals other than those who own or operate

the institution receive a benefit without any expectation of reciprocity from the recipient. *SW Oregon Pub. Def. Services*, 312 Or at 91. The size of the purported gift is important in determining whether, on the whole, an institution's operations evince "gift or giving," but at the margins, any gift weighs in favor of the purportedly charitable institution. Taxpayer's internship program on its own might not be sufficient to show the presence of "gift or giving" in Serenity's overall operation, but as part of a larger package of giving it weighs in Serenity's favor.

Second, the court does not consider the presence of an incidental recruiting benefit to Serenity from sponsoring the internship program disqualifying as evidence of the presence of "gift or giving." Testimony at trial made clear that Serenity's interns did not ease (and in fact, most likely worsened) the workload for Serenity's CADCs. Moreover, the interns had no obligation to work for Serenity after completing their training. They could, and did, accept employment with other employers. Whatever recruiting benefit Serenity derived seems insubstantial and, frankly, unavoidable given that Serenity both trains and employs CADCs. The overall character of the internship program adds to the impression that Serenity's operations contained the element of "gift or giving" required of a charitable institution by the courts of this state.

Finally, the county argues that the court should not consider Serenity's community outreach activities as signs of "gift or giving" because they are *de minimis*, because Serenity's expert counted unpaid time by Serenity's staff as giving on Serenity's behalf, and because these activities amount to marketing by Serenity. The discussion above concerning Serenity's internship program dispenses with the county's argument that Serenity's outreach activities are too small to be considered. However, the court agrees, for reasons stated by the Supreme Court in *YMCA v. Dept of Rev.*, that Serenity's expert erred in counting uncompensated time spent by Serenity's employees and board members to promote the mission of Serenity as "giving" by Serenity. *See YMCA*, 308 Or 644, 654, 784 P2d 1086 (1989). The court gives Serenity's community outreach activities little weight

in determining whether it shows the presence of "gift or giving."

## V.   CONCLUSION

Based on the foregoing analysis, the court concludes that the required element of "gift or giving" is present in the activities of Serenity. As a consequence, the court concludes that Serenity, taken on the whole, was a charitable institution during the 2010-11 tax year. The court further concludes that SLI and SLHS, the separately incorporated legal entities comprising Serenity, were both charitable institutions for purposes of ORS 307.130 and for purposes of applying ORS 307.166 during that same tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that the property leased to SLI by SLHS is exempt from ad valorem property tax by reason of ORS 307.166.