IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

ASANTE PHYSICIAN PARTNERS, a )
division of Asante, )
          )
         Plaintiff, ) TC-MD 130551D
          )
        v. )
          )
JOSEPHINE COUNTY ASSESSOR, )
          )
         Defendant. ) **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered

February 9, 2015. The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals Defendant's denial of Plaintiff's application for exemption, dated

September 18, 2013, for property identified as Accounts R342639 and R341366 (subject

property) for the 2013-14 tax year.[1] A telephone trial was held on October 27, 2014. Gerald M.

Shean III, Attorney-at Law, appeared on behalf of Plaintiff. Ben Dean (Dean), Manager; Stefen

Harvey (Harvey), Plaintiff's Chief Financial Officer; Ellen Tuohey (Tuohey), Coordinator for

Real Estate and Sustainability; and Leslie Lindsey (Lindsey), Asante Chief Financial Officer

and compliance officer, testified on behalf of Plaintiff. Leah C. Harper, Assistant County

Counsel, appeared on behalf of Defendant. John McCafferty (McCafferty), Chief Deputy

Appraiser, testified on behalf of Defendant. Plaintiff's Exhibits 1 to 22, and Defendant's

/ / /

/ / /

/ / /

---

[1] The evidence presented in this case applies to two related cases, TC-MD 130549D and TC-MD 130551D.

Exhibits A to Y, were received without objection. Plaintiff's Exhibits 9, 11, 14 and 15 and

Defendant's Exhibit M were protected by court order, filed July 22, 2014.[2]

## I. STATEMENT OF FACTS

The parties filed a Stipulation of Facts on October 23, 2014, stating:

(1)     Plaintiff is a 501(c)(3) Oregon nonprofit corporation;

(2)     Plaintiff is "organized and operated exclusively for charitable, religious, educational, and scientific purposes and that no part of Plaintiff's net earnings shall inure to the benefit of or be distributable to its members, trustees, officers, or other private persons except as reasonable compensation for services rendered to the corporation";

(3)     "Plaintiff's sole member is Asante, which is also an Oregon nonprofit corporation, exempt from income tax under Section 501(c)(3) of the Internal Revenue Code";

(4)     "The charitable status of Asante is not at issue";

(5)     "APP [Plaintiff] operated an endocrinology and urology practice at 700 SW Ramsey Avenue, Suite 101 in Grants Pass [Account R336695], and a family medicine practice at 520 SW Ramsey Avenue, Suite 101 in Grants Pass [Accounts R342639 and R341366]";

(6)     Each facility is "leased from a taxable owner/Lessor to a nontaxable Lessee [Asante]" and "is then subleased by the nontaxable Lessee to Plaintiff";

(7)     The lease for Account R336695 commenced on July 1, 2013. The endocrinology practice opened on August 5, 2013, and the urology practice opened on September 16, 2013; and

(8)     The lease for Accounts R342639 and R341366 commenced September 1, 2012.

(Stip Facts at 1-3.)

Harvey testified that Plaintiff's mission is to bring quality care to southern Oregon

residents, though in achieving its mission Plaintiff "operates at a loss." Harvey testified that

---

[2] The court relied on evidence contained in these protected exhibits. Due to the protective order the analysis in this Decision is presented broadly and lacks the specificity and detail common to other written decisions of this court.

Plaintiff's charitable purpose is stated in Plaintiff's bylaws: "to enhance the quality, and cost-effective delivery, of healthcare services in communities served by the Corporation by serving as a vehicle to promote the clinical integration of physician and hospital services." (Ptf's Ex 8 at 1.) Defendant challenged Harvey's statement that Plaintiff's mission was "charitable," noting that Plaintiff's federal form 990 stated "[o]ne of the main goals of Asante Physician Partners is to recruit a broad array of doctors to relocate to our community, as well as retain the doctors who already reside here." (Def's Ex J at 28.) Harvey testified that Plaintiff provided medical services as a nonprofit "regardless of a patient's ability to pay" and accepted government insurance, *e.g.*, Medicare, Medicaid and Veterans Administration. Harvey stated that Plaintiff's largest program service accomplishments for 2013 were: (1) "to see 10,249 Medicare, 6,822 Medicaid, and 1,050 uninsured patients. These patients might have been turned away from obtaining medical services by a physician in private practice. * * * [Plaintiff] feel[s] this is a significant benefit to the community"; (2) "[T]he recruitment and retention of doctors in our community"; and (3) that "all the doctors * * * recruited from out of the area filled an important community need." (Def's Ex J at 2.) Harvey testified that Plaintiff is in a rural area with a "high proportion of Medicare and Medicaid patients" and private practitioners find "those patients are less desirable to build a practice."

Lindsey testified that Plaintiff employed a third party to perform community physician need assessments and Plaintiff based its recruitment and hiring of physicians on these third party assessments. Harvey testified that Plaintiff's board members do not receive compensation for their services as board members, and that the physicians who serve on the board are only compensated for their work as physicians. Harvey testified that all compensation paid to officers and key employees is determined by the compensation committee and is compared to

"comparable positions at other healthcare organizations of similar size and scope." (*See* Def's Ex J at 31.)

Harvey testified about Plaintiff's financial assistance policy. Harvey testified about the eligibility criteria and other factors Plaintiff considered when determining whether to offer financial assistance to an applicant. He testified that Plaintiff used a "sliding scale" to determine when a person qualifies for discounted services. Harvey testified about the application process and the documentation an applicant must provide before receiving assistance. He testified that the financial assistance application instructions stated that "[a]pplicants are required to provide all of the information listed below within 10 business days from the date of this letter. If any information is not provided or the information is not received within the 10 days the application will be closed and considered denied." (Ptf's Ex 13 at 1(emphasis omitted).) Harvey listed the required information, stating:

> "Provide proof of income: (provide all that apply)
> "a.     Pay stubs – last 3
> "b.     Bank statement – last 2
> "c.     SSI benefit letter
> "d.     Last 2 years federal income tax returns
> "e.     Verification of unemployment (copy of unemployment checks or notarized signed affidavit."

(*Id.*) Harvey testified that the financial assistance application was not required to be completed before receiving medical treatment. During cross examination Harvey testified that all "balances" are transferred to the guarantor (defined as the person responsible to pay for medical services) before financial assistance is granted. He testified that the financial assistance is effective for a patient's current balance, plus any balances accrued for the following six months. Harvey testified that the account balance is due at the end of the six months. Harvey testified that the remaining balance "could go to collections," and that a patient "could reapply for

financial assistance" at the end of the six months. Harvey stated that "if a patient is eligible for government assistance and refused that assistance, the patient would not be eligible for financial assistance from Plaintiff." Harvey testified that if a patient "refused to provide the required information" requested in the financial assistance application the "patient's application would be denied."

Harvey testified that "prospective patients are required to sign the conditions of services rendered form" before receiving medical treatment. Harvey referenced Plaintiff's conditions of services rendered form:

> "I agree, whether I sign as agent or as patient, that in consideration of the services to be rendered to the patient, I hereby individually obligate myself to pay any Asante account in accordance with the regular rates and terms of said account, including its financial assistance policies. Should the account be referred to an attorney or collection agency for collection, the undersigned shall pay actual attorneys' fees and collection expenses."

(Def's Ex Q at 1-2.) Harvey testified that Plaintiff's "Financial Responsibility" pamphlet stated that co-payments, deductibles, and co-insurance payments are due at the time of service. (Ptf's Ex 12 at 2.) Harvey testified that Plaintiff "has its own separate collection agency protocols," but that Plaintiff and Asante "follow similar practices," and Plaintiff "uses collection agencies to collect on unpaid accounts."

Harvey testified about patient charges, payments and adjustments. He testified that Plaintiff received payments totaling "below cost" based on the ratio of the number of patients to total charges collected. Harvey concluded that Plaintiff is serving the community when it provides health care at "below cost" to a significant community segment.

McCafferty testified about the "general factors" for charitable use of a qualifying tax exempt property. For the subject properties, he testified as to the total number of patient visits at each location, and the number of patients who received some form of discount, including cash

discounts, sliding fees and free care. (Def's Ex L.) McCafferty testified to the number of patients that had applied for and been denied financial assistance and the number of accounts that were referred to a collection agency. McCafferty testified that for the time period of July 1, 2013, through February 14, 2014, the endocrinology and urology practice had 1,151 office visits,[3] six patients who received discounted fees, three patients who received free services, nine patients who applied for financial assistance, and two patients who applied for financial assistance but were denied. (*Id.*) McCafferty testified that for the time period of July 1, 2013, through Feb 14, 2014, the family medical practice had 5,546 office visits, five patients who received discounted fees, three patients who received free services, five patients who applied for financial assistance, and two patients who applied for financial assistance but were denied. McCafferty testified that for the period from October 2013 through September 2014, he calculated the ratio of charity expenses to gross revenue for all of Plaintiff's operations, determining expenses of 0.5 percent of total revenues. (*See* Def's Ex N.) He testified that he then calculated the charity care ratio for the start of the 2014 fiscal year through May 2014 at the endocrinology and urology practice of 0.05 percent, and 0.17 percent for the family medical practice. McCafferty testified as to some of the rules that hospitals in Oregon follow in reporting charity care. He testified that when hospitals report charity care costs, the "expenses are listed in terms of actual cost to the hospital, not charges." (Def's Ex O at 4; *see also* Def's Ex P at 7.)

During cross-examination, McCafferty testified that many factors are considered when determining whether to grant a property tax exemption. McCafferty acknowledged that many private practices in Plaintiff's service area exclude or limit patients on government assistance programs. McCafferty stated that providing medical care to Medicare and Medicaid patients was

---

[3] Office visits are the total number of individual visits, not the number of unique patients. (Def's Ex L.)

a factor that he considered, as well as the overall access to healthcare in the area. He testified that "write-off" of Medicare and Medicaid patients' account balances and "bad debts" are not "charitable giving." McCafferty testified that Plaintiff's website "bill paying tabs" stated "nothing about charity" and patients are "expected to pay the full amount of charges incurred."

Dean testified that the endocrinology and urology practice lease was signed on June 23, 2013, and dated June 24, 2013. Tuohey testified that the lease commenced on July 1, 2013, and that Plaintiff had access to the property before that date. (*See* Ptf's Ex 2.) Dean and Tuohey testified that Plaintiff prepared the property for use before the start of the lease, stating that the "keys were received on June 27, 2013," the facility was cleaned, and furniture ordered before July 1, 2013. (*See* Ptf's Exs 16 at 1; 17.) Dean testified that there were no "restrictions on access" after receipt of the keys.

## II. ANALYSIS

The issue in this case is whether the subject property is exempt under ORS 307.130.[4] In Oregon, "[t]axation is the rule and exemption from taxation is the exception." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 426 (1986) (citations omitted), *see also* ORS 307.030. Plaintiff, as the party seeking exemption, has the burden of proof, and must prove its case by a preponderance of the evidence. *See* ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

ORS 307.130(2) states that "property owned or being purchased by * * * charitable * * * institutions shall be exempt from taxation." Plaintiff did not own, nor was it purchasing the subject property. Plaintiff leased the subject property from its sole member, Asante.

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

(Stip Facts at 1-3.) This relationship is not unusual, nor is it unfamiliar to the court. *See Serenity Lane, Inc. v. Lane County Assessor* (*Serenity Lane*)*,* 21 OTR 229, 234 (2013). The court in *Serenity Lane* explained the relationship between ORS 307.130 and ORS 307.166, stating that if

> "an institution that is entitled to claim exemption from property tax under a
> provision of ORS chapter 307 leases its property to another institution that is also
> entitled to claim exemption from property tax for property that it owns, then the
> property remains exempt from property tax as long as the lessee institution uses
> the property in the manner required under the statute that would entitle that lessee
> institution to claim exemption for the property if it owned the property."

*Serenity Lane,* 21 OTR at 234. In this case the parties have stipulated that "[t]he charitable status of Asante is not at issue." (Stip Facts at 2.) The only issue before the court is whether Plaintiff is a qualifying entity under ORS 307.130.

To be eligible for exemption Plaintiff must be an eligible organization and the property must be "actually and exclusively occupied or used" by the organization in furtherance or its work. ORS 307.130(2)(a). In determining whether an institution is eligible for exemption under ORS 307.130 three requirements must be met:

"(1) Charity as the organization's 'primary, if not sole, object';

"(2) The organization's operations must serve the charitable mission of the

organization; and

"(3) The presence of an element of 'gift or giving' in the activities of the

organization."

*Serenity Lane,* 21 OTR at 235, *citing SW Oregon Pub. Def. Services v. Dept. of Rev.* 312 Or 82, 89, 812 P2d 1292 (1991). The parties are in agreement that Plaintiff meets the first two requirements. (*See* Stip Facts at 1.)

The Oregon Supreme Court has used the following non-exhaustive list of factors when determining if an institution meets the "gift or giving" factor:

> "(1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(2) Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> "(3) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;
>
> "(4) Whether charges are made to all and, if made, are lesser charges made to the
>
> poor or are any charges made to the indigent."

*SW Oregon Pub. Def. Services*, 312 Or at 87; OAR 150-307.130-(A)(3)(d)(C);[5] *see also Serenity Lane*, 21 OTR at 235; *Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245, 251 (2013). Those four factors will be discussed in the context of this case.

A.    *Application of Receipts*

The parties do not dispute that Plaintiff used its receipts for the upkeep and maintenance of its business. The evidence shows that Plaintiff is actively engaged in providing medical services to the local community and reinvests the proceeds from those services in its business operations. Plaintiff actively recruited new doctors and opened new facilities. Plaintiff's proceeds were not distributed to any members, owners, or employees other than as compensations for services rendered.

B.    *Treatment Without Regard to Ability to Pay*

There was no evidence that Plaintiff did not provide the same level of treatment to all of its patients, irrespective of a particular patient's ability to pay.

C.    *Doors Open to Rich and Poor Alike*

There is no evidence that Plaintiff engaged in any discriminatory behavior relating to race, color, or creed. The evidence presented shows that Plaintiff was predominantly serving

---

[5] Oregon Administrative Rule (OAR) 150-307.130-(A)(3)(d)(C).

patients of moderate financial means. Plaintiff states that seeing Medicare and Medicaid patients was its largest service accomplishment for 2013. (Def's Ex J at 2.) There was no evidence that Plaintiff engaged in any discriminatory behavior relating to a patient's ability to pay once that person became a patient. This court has previously concluded that it is difficult to analyze the third factor without looking at the fourth factor as "equal treatment of patients after they have been admitted is a hollow sort of charity if the ability of a patient to pay for treatment instead simply acts as a bar to admission in the first place." *Hazelden*, 21 OTR at 253.

D.      *Charges*

*Hazelden* describes the interplay of the third and fourth factors : "[I]n addressing the third factor the court must make a necessary detour to address the fourth factor." *See Hazelden*, 21 OTR at 253-254. In the matter before the court, Plaintiff charges for its services and it expects those patients who are financially able to pay full price. *See* OAR 150-307.130-(A)(3)(d)(C)(iv). "[A]n organization [that] charges a fee for its services does not necessarily invalidate its claimed status as charitable;" *see also Gregory v. Salem General Hospital*, 175 Or 464, 469, 153 P2d 837 (1944) (holding that a hospital was charitable even though fees were generally charged and "charity [was] not administered * * * with a free hand." Potential problems arise when the services in question come with a high price tag. A high price tag can create "a *de facto* ban on patients who lack either sufficient personal assets or sufficient insurance to pay for the treatment if those prices are insisted upon in all cases and if those who cannot afford to pay are denied treatment for no other reason than their inability to pay." *Hazelden*, 21 OTR at 254. One way the problem created by a high price tag can be remediated is through the use of a sliding fee scale, based on a patients financial need. A sliding scale alone does necessarily remedy the potential problem; "if the criteria used by taxpayer to determine who

/ / /

is to be given discounted care, and how much of a discount to provide, results in the substantial exclusion of the poor and indigent from treatment[,]" the *de facto* ban can still exist. *Id.*

Before receiving treatment, Plaintiff's potential patients are required to sign, or have a guarantor sign on their behalf, Plaintiff's "Conditions of Services Rendered" form. (Def's Ex Q.) That form's "Financial Agreement" section states that the person signing the form agrees that "I hereby individually obligate myself to pay any Asante account in accordance with the regular rates and terms of said account, including its financial assistance policies." (*Id.* at 1-2.) It is only after agreeing to pay, in full, the potential charges from Plaintiff that a patient may apply for financial assistance.

1.      *Direct Financial Assistance*

Plaintiff's financial assistance is based on family size and income level compared to federal poverty level guidelines. Plaintiff utilizes a sliding fee scale and allows for discounts of up to 100 percent. In applying for financial assistance Plaintiff requires several different kinds of income verification and in some cases Plaintiff will run a credit report on the applicant. (*See* Def's Ex R at 2.) Plaintiff only allows patients 10 days to submit the required income verification documentation. Another condition that Plaintiff has placed on patients before granting financial assistance is that Plaintiff requires applicants obtain health insurance if eligible. If a patient refuses insurance coverage for which they are eligible, Plaintiff will deny the application, and refuse any financial assistance to the patient. (*See id.* at 1-2.) Any discount granted by Plaintiff is only effective for six months and all outstanding balances are due at that time. Plaintiff does permit a patient the ability to reapply for assistance at the end of the six month period.

/ / /

While a purely quantitative approach is not an appropriate test to determine whether an applicant meets the "gift or giving" requirements that information can still be insightful. *See Hazelden*, 21 OTR 245, 251 (finding that the gift or giving requirement was not met "simply because taxpayer's patient aid exceed[ed] four percent of annual revenues and more than eight percent of taxpayer's patients receiv[ed] such aid."). In this case, the evidence presented by the parties does not allow for a comparison of the number of patients granted assistance to the overall number of patients seen. The evidence did show that the actual number of patients that applied for assistance was very low with an even smaller number being granted financial assistance. The monetary value of the assistance that was granted was also very small in comparison to Plaintiff's overall revenue. These quantitative indicators, while not determinative, give substance to Plaintiff's overall financial assistance.

Given the evidence presented, Plaintiff's direct financial assistance was insufficient, on its own, to meet the gift or giving test. Plaintiff's financial assistance was minimally provided to patients, and conditioned in such a way as to limit its overall impact. Even though Plaintiff does engage in providing financial assistance, that assistance is not charitable for purposes of ORS 307.130.

2. *Medicare and Medicaid*

Plaintiff's alternative argument to meet the gift or giving requirement is through its extensive offering of medical services to Medicare and Medicaid patients. Plaintiff listed providing these services as its primary accomplishment for the year ending September 30, 2013. Based on the evidence, these patients made up a substantial portion of Plaintiff's patients, and a significant portion of Plaintiff's revenue. According to Plaintiff, these services are provided below market rates. Plaintiff did not provide evidence of the market rate for these services, nor

did it provide evidence of what Plaintiff's actual costs were in providing these services. Without evidence in support of Plaintiff's claims, the court cannot determine if there is an element of gift or giving provided by Plaintiff in providing access to medical care for Medicare and Medicaid patients.

### 3. *Recruitment*

Plaintiff also devoted resources to recruiting and hiring physicians who practiced in specialties that were not already present in Plaintiff's service area. Plaintiff stated that it relied on third parties to identify physicians and specialists in practice areas that were underrepresented or unavailable in Plaintiff's market. Plaintiff did not provide any evidence about the availability of medical specialties in its service area or expert third party testimony regarding the medical practice specialty needs of its service area. Plaintiff has not provided sufficient evidence or explanation to evaluate this claim to determine if it constitutes a gift or giving.

### III. CONCLUSION

Plaintiff's monetary contribution to those lacking the financial means to afford Plaintiff's services is incidental in relation to its primary business of providing medical services, and is on its own insufficient to meet the gift or giving requirements. There was insufficient evidence for the court to fully evaluate Plaintiff's other two purported charitable activities (providing health care access to low-income residents or residents with government health insurance in its service area, and recruitment of medical specialists not already present in its service area) to determine if these activities were a gift or giving. After carefully considering all of the testimony and evidence presented the court finds that Plaintiff did not meet its burden of proof that Plaintiff has an element of gift or giving in its activities, and is not a charitable organization for purposes of ORS 307.130(1). Because Plaintiff does not meet the gift or giving requirement, the court need

not determine whether the subject property was exclusively used by Plaintiff under

ORS 307.130(2)(a). Plaintiff's appeal is denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff did not meet its burden of proof

that Plaintiff is a charitable organization under ORS 307.130. Plaintiff's appeal is denied.

Dated this ____ day of February 2015.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This Final Decision was signed by Presiding Magistrate Jill A. Tanner on February 27, 2015. The Court filed and entered this Final Decision on February 27, 2015.*